**BURSOR & FISHER, P.A.**
L. Timothy Fisher (SBN 191626)
1990 North California Boulevard, Suite 940
Walnut Creek, California 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
Email:  ltfisher@bursor.com

**HEDIN HALL LLP**
Frank S. Hedin (SBN 291289)
Four Embarcadero Center, Suite 1400
San Francisco, California 94104
Telephone: (415) 766-3534
Facsimile: (415) 402-0058
Email: fhedin@hedinhall.com

*Counsel for Plaintiff and the Putative Class*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANNON SENSIBAUGH, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> EF EDUCATION FIRST, INC., <br><br> Defendant. | Case No.: 2:20-cv-01068-MWF-PVC <br><br> **PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY** <br><br> Judge: Hon. Michael W. Fitzgerald |

**NOTICE IS HEREBY GIVEN** that the Supreme Court has issued a decision in *Barr v. American Association of Political Consultants*, No. 19-631 (hereinafter "*AAPC*").  In *AAPC*, the Supreme Court affirmed the ruling of the Fourth Circuit and held that, while the debt-collection exception to the Telephone Consumer Protection Act, 47 U.S.C. § 227, was unconstitutional, it was severable from the remainder of the Telephone Consumer Protection Act.  *AAPC*, at 25 ("We hold that the 2015

government-debt exception added an unconstitutional exception to the law.  We cure that constitutional violation by invalidating the 2015 government-debt exception and severing it from the remainder of the statute.").  The opinion is attached hereto as **Exhibit A**.  Accordingly, this Court should lift the stay on this case that was issued pending *AAPC*.  ECF No. 27.

Dated: July 7, 2020

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:      */s/ L. Timothy Fisher*
         L. Timothy Fisher

L. Timothy Fisher (SBN 191626)
1990 North California Boulevard, Suite 940
Walnut Creek, California 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
Email:  ltfisher@bursor.com

**HEDIN HALL LLP**
Frank S. Hedin (SBN 291289)
Four Embarcadero Center, Suite 1400
San Francisco, California 94104
Telephone: (415) 766-3534
Facsimile: (415) 402-0058
Email: fhedin@hedinhall.com

*Counsel for Plaintiff and the Putative Class*

**EXHIBIT A**

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BARR, ATTORNEY GENERAL, ET AL. *v.* AMERICAN ASSOCIATION OF POLITICAL CONSULTANTS, INC., ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 19–631.   Argued May 6, 2020—Decided July 6, 2020

In response to consumer complaints, Congress passed the Telephone Consumer Protection Act of 1991 (TCPA) to prohibit, *inter alia*, almost all robocalls to cell phones. 47 U. S. C. §227(b)(1)(A)(iii).  In 2015, Congress amended the robocall restriction, carving out a new government-debt exception that allows robocalls made solely to collect a debt owed to or guaranteed by the United States.  129 Stat. 588.  The American Association of Political Consultants and three other organizations that participate in the political system filed a declaratory judgment action, claiming that §227(b)(1)(A)(iii) violated the First Amendment.  The District Court determined that the robocall restriction with the government-debt exception was content-based but that it survived strict scrutiny because of the Government's compelling interest in collecting debt.  The Fourth Circuit vacated the judgment, agreeing that the robocall restriction with the government-debt exception was a content-based speech restriction, but holding that the law could not withstand strict scrutiny.  The court invalidated the government-debt exception and applied traditional severability principles to sever it from the robocall restriction.

*Held*: The judgment is affirmed.

923 F. 3d 159, affirmed.

JUSTICE KAVANAUGH, joined by THE CHIEF JUSTICE, JUSTICE THOMAS, and JUSTICE ALITO, concluded in Part II that the 2015 government-debt exception violates the First Amendment.  Pp. 6–9.

(a) The Free Speech Clause provides that government generally "has no power to restrict expression because of its message, its ideas, its

subject matter, or its content." *Police Dept. of Chicago* v. *Mosley,* 408
U. S. 92, 95. Under this Court's precedents, content-based laws are
subject to strict scrutiny. See *Reed* v. *Town of Gilbert,* 576 U. S. 155,
165. Section 227(b)(1)(A)(iii)'s robocall restriction, with the govern-
ment-debt exception, is content based because it favors speech made
for the purpose of collecting government debt over political and other
speech. Pp. 6–7.

   (b) The Government's arguments for deeming the statute content-
neutral are unpersuasive. First, §227(b)(1)(A)(iii) does not draw dis-
tinctions based on speakers, and even if it did, that would not "auto-
matically render the distinction content neutral." *Reed*, 576 U. S., at
170. Second, the law here focuses on whether the caller is *speaking*
about a particular topic and not, as the Government contends, simply
on whether the caller is engaged in a particular economic activity. See
*Sorrell* v. *IMS Health Inc.,* 564 U. S. 552, 563–564. Third, while "the
First Amendment does not prevent restrictions directed at commerce
or conduct from imposing incidental burdens on speech," this law "does
not simply have an effect on speech, but is directed at certain content
and is aimed at particular speakers." *Id.*, at 567.

   (c) As the Government concedes, the robocall restriction with the
government-debt exception cannot satisfy strict scrutiny. The Govern-
ment has not sufficiently justified the differentiation between govern-
ment-debt collection speech and other important categories of robocall
speech, such as political speech, issue advocacy, and the like. Pp. 7–9.

   JUSTICE KAVANAUGH, joined by THE CHIEF JUSTICE and JUSTICE
ALITO, concluded in Part III that the 2015 government-debt exception
is severable from the underlying 1991 robocall restriction. The TCPA
is part of the Communications Act, which has contained an express
severability clause since 1934. Even if that clause did not apply to the
exception, the presumption of severability would still apply. See, *e.g.,*
*Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*,
561 U. S. 477. The remainder of the law is capable of functioning in-
dependently and would be fully operative as a law. Severing this rel-
atively narrow exception to the broad robocall restriction fully cures
the First Amendment unequal treatment problem and does not raise
any other constitutional problems. Pp. 9–24.

   JUSTICE SOTOMAYOR concluded that the government-debt exception
fails under intermediate scrutiny and is severable from the rest of the
Act. Pp. 1–2.

   JUSTICE BREYER, joined by JUSTICE GINSBURG and JUSTICE KAGAN,
would have upheld the government-debt exception, but given the con-
trary majority view, agreed that the provision is severable from the
rest of the statute. Pp. 11–12.

   JUSTICE GORSUCH concluded that content-based restrictions on

Syllabus

speech are subject to strict scrutiny, that the Telephone Consumer Protection Act's rule against cellphone robocalls is a content-based restriction, and that this rule fails strict scrutiny and therefore cannot be constitutionally enforced.  Pp. 1–4.

KAVANAUGH, J., announced the judgment of the Court and delivered an opinion, in which ROBERTS, C. J., and ALITO, J., joined, and in which THOMAS, J., joined as to Parts I and II.  SOTOMAYOR, J., filed an opinion concurring in the judgment.  BREYER, J., filed an opinion concurring in the judgment with respect to severability and dissenting in part, in which GINSBURG and KAGAN, JJ., joined.  GORSUCH, J., filed an opinion concurring in the judgment in part and dissenting in part, in which THOMAS, J., joined as to Part II.

Cite as: 591 U. S. ____ (2020)    1

Opinion of KAVANAUGH, J.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 19–631

WILLIAM P. BARR, ATTORNEY GENERAL, ET AL., PETITIONERS *v.* AMERICAN ASSOCIATION OF POLITICAL CONSULTANTS, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[July 6, 2020]

JUSTICE KAVANAUGH announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE and JUSTICE ALITO join, and in which JUSTICE THOMAS joins as to Parts I and II.

Americans passionately disagree about many things. But they are largely united in their disdain for robocalls. The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone. The States likewise field a constant barrage of complaints.

For nearly 30 years, the people's representatives in Congress have been fighting back. As relevant here, the Telephone Consumer Protection Act of 1991, known as the TCPA, generally prohibits robocalls to cell phones and home phones. But a 2015 amendment to the TCPA allows robocalls that are made to collect debts owed to or guaranteed by the Federal Government, including robocalls made to collect many student loan and mortgage debts.

This case concerns robocalls to cell phones. Plaintiffs in this case are political and nonprofit organizations that want

to make political robocalls to cell phones. Invoking the First Amendment, they argue that the 2015 government-debt exception unconstitutionally favors debt-collection speech over political and other speech. As relief from that unconstitutional law, they urge us to invalidate the entire 1991 robocall restriction, rather than simply invalidating the 2015 government-debt exception.

Six Members of the Court today conclude that Congress has impermissibly favored debt-collection speech over political and other speech, in violation of the First Amendment. See *infra*, at 6–9; *post*, at 1–2 (SOTOMAYOR, J., concurring in judgment); *post*, at 1, 3 (GORSUCH, J., concurring in judgment in part and dissenting in part). Applying traditional severability principles, seven Members of the Court conclude that the entire 1991 robocall restriction should not be invalidated, but rather that the 2015 government-debt exception must be invalidated and severed from the remainder of the statute. See *infra*, at 10–25; *post*, at 2 (SOTOMAYOR, J., concurring in judgment); *post*, at 11–12 (BREYER, J., concurring in judgment with respect to severability and dissenting in part). As a result, plaintiffs still may not make political robocalls to cell phones, but their speech is now treated equally with debt-collection speech. The judgment of the U. S. Court of Appeals for the Fourth Circuit is affirmed.

## I

### A

In 1991, Congress passed and President George H. W. Bush signed the Telephone Consumer Protection Act. The Act responded to a torrent of vociferous consumer complaints about intrusive robocalls. A growing number of telemarketers were using equipment that could automatically dial a telephone number and deliver an artificial or prerecorded voice message. At the time, more than 300,000 solicitors called more than 18 million Americans every day.

Opinion of KAVANAUGH, J.

TCPA, §2, ¶¶3, 6, 105 Stat. 2394, note following 47 U. S. C. §227. Consumers were "outraged" and considered robocalls an invasion of privacy "regardless of the content or the initiator of the message." ¶¶6, 10.

A leading Senate sponsor of the TCPA captured the zeitgeist in 1991, describing robocalls as "the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall." 137 Cong. Rec. 30821 (1991).

In enacting the TCPA, Congress found that banning robocalls was "the only effective means of protecting telephone consumers from this nuisance and privacy invasion." TCPA §2, ¶12. To that end, the TCPA imposed various restrictions on the use of automated telephone equipment. §3(a), 105 Stat. 2395. As relevant here, one restriction prohibited "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice" to "any telephone number assigned to a paging service, *cellular telephone service*, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call." *Id.*, at 2395–2396 (emphasis added). That provision is codified in §227(b)(1)(A)(iii) of Title 47 of the U. S. Code.

In plain English, the TCPA prohibited almost all robocalls to cell phones.[1]

---

[1] The robocall restriction, as implemented by the Federal Communications Commission, bars both automated voice calls and automated text messages. See *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, 14115 (2003). The robocall restriction applies to "persons," which does not include the Government itself. See 47 U. S. C. §153(39). Congress has also authorized the FCC to promulgate regulatory exceptions to the robocall restriction. See §227(b)(2)(C). The FCC has authorized various exceptions over the years, such as exceptions for package-delivery notifications and certain

Twenty-four years later, in 2015, Congress passed and President Obama signed the Bipartisan Budget Act. In addition to making other unrelated changes to the U. S. Code, that Act amended the TCPA's restriction on robocalls to cell phones. It stated:

> "(a) IN GENERAL.—Section 227(b) of the Communications Act of 1934 (47 U. S. C. 227(b)) is amended—
>
> (1) in paragraph (1)—
>
> (A) in subparagraph (A)(iii), by inserting ', unless such call is made solely to collect a debt owed to or guaranteed by the United States' after 'charged for the call.'" 129 Stat. 588.[2]

In other words, Congress carved out a new government-debt exception to the general robocall restriction.

The TCPA imposes tough penalties for violating the robocall restriction. Private parties can sue to recover up to $1,500 per violation or three times their actual monetary losses, which can add up quickly in a class action. §227(b)(3). States may bring civil actions against robocallers on behalf of their citizens. §227(g)(1). And the

---

healthcare-related calls. In this case, plaintiffs do not separately challenge the validity of the FCC's regulatory exceptions.

[2] After the 2015 amendment, §227(b)(1) now provides:

"It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—

(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—

.          .          .          .          .

(iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, *unless such call is made solely to collect a debt owed to or guaranteed by the United States.*" (Emphasis added.)

Opinion of KAVANAUGH, J.

Federal Communications Commission can seek forfeiture penalties for willful or repeated violations of the statute. §503(b).

### B

Plaintiffs in this case are the American Association of Political Consultants and three other organizations that participate in the political system. Plaintiffs and their members make calls to citizens to discuss candidates and issues, solicit donations, conduct polls, and get out the vote. Plaintiffs believe that their political outreach would be more effective and efficient if they could make robocalls to cell phones.[3] But because plaintiffs are not in the business of collecting government debt, §227(b)(1)(A)(iii) prohibits them from making those robocalls.

Plaintiffs filed a declaratory judgment action against the U. S. Attorney General and the FCC, claiming that §227(b)(1)(A)(iii) violated the First Amendment. The U. S. District Court for the Eastern District of North Carolina determined that the robocall restriction with the government-debt exception was a content-based speech regulation, thereby triggering strict scrutiny. But the court concluded that the law survived strict scrutiny, even with the content-based exception, because of the Government's compelling interest in collecting debt.

The U. S. Court of Appeals for the Fourth Circuit vacated the judgment. *American Assn. of Political Consultants, Inc.* v. *FCC*, 923 F. 3d 159 (2019). The Court of Appeals agreed with the District Court that the robocall restriction with the government-debt exception was a content-based speech restriction. But the court held that the law could not withstand strict scrutiny and was therefore unconstitutional. The Court of Appeals then applied traditional severability

---

[3] Plaintiffs have not challenged the TCPA's separate restriction on robocalls to home phones. See 47 U. S. C. §227(b)(1)(B).

principles and concluded that the government-debt exception was severable from the underlying robocall restriction. The Court of Appeals therefore invalidated the government-debt exception and severed it from the robocall restriction.

The Government petitioned for a writ of certiorari because the Court of Appeals invalidated part of a federal statute—namely, the government-debt exception. Plaintiffs supported the petition, arguing from the other direction that the Court of Appeals did not go far enough in providing relief and should have invalidated the entire 1991 robocall restriction rather than simply invalidating the 2015 government-debt exception. We granted certiorari. 589 U. S. ___ (2020).

## II

Ratified in 1791, the First Amendment provides that Congress shall make no law "abridging the freedom of speech." Above "all else, the First Amendment means that government" generally "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 95 (1972).

The Court's precedents allow the government to "constitutionally impose reasonable time, place, and manner regulations" on speech, but the precedents restrict the government from discriminating "in the regulation of expression on the basis of the content of that expression." *Hudgens* v. *NLRB*, 424 U. S. 507, 520 (1976). Content-based laws are subject to strict scrutiny. See *Reed* v. *Town of Gilbert*, 576 U. S. 155, 163–164 (2015). By contrast, content-neutral laws are subject to a lower level of scrutiny. *Id.*, at 166.

Section 227(b)(1)(A)(iii) generally bars robocalls to cell phones. Since the 2015 amendment, the law has exempted robocalls to collect government debt. The initial First Amendment question is whether the robocall restriction,

Opinion of KAVANAUGH, J.

with the government-debt exception, is content-based. The answer is yes.

As relevant here, a law is content-based if "a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Reed,* 576 U. S., at 163. That description applies to a law that "singles out specific subject matter for differential treatment." *Id.*, at 169. For example, "a law banning the use of sound trucks for political speech—and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed." *Ibid.*; see, *e.g.*, *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 116 (1991); *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U. S. 221, 229–230 (1987); *Widmar* v. *Vincent*, 454 U. S. 263, 265, 276–277 (1981); *Carey* v. *Brown*, 447 U. S. 455, 459–463 (1980); *Erznoznik* v. *Jacksonville*, 422 U. S. 205, 211–212 (1975); *Mosley*, 408 U. S., at 95–96.

Under §227(b)(1)(A)(iii), the legality of a robocall turns on whether it is "made solely to collect a debt owed to or guaranteed by the United States." A robocall that says, "Please pay your government debt" is legal. A robocall that says, "Please donate to our political campaign" is illegal. That is about as content-based as it gets. Because the law favors speech made for collecting government debt over political and other speech, the law is a content-based restriction on speech.

The Government advances three main arguments for deeming the statute content-neutral, but none is persuasive.

*First*, the Government suggests that §227(b)(1)(A)(iii) draws distinctions based on speakers (authorized debt collectors), not based on content. But that is not the law in front of us. This statute singles out calls "made solely to collect a debt owed to or guaranteed by the United States," not all calls from authorized debt collectors.

In any event, "the fact that a distinction is speaker based" does not "automatically render the distinction content neutral." *Reed*, 576 U. S., at 170; *Sorrell* v. *IMS Health Inc.*, 564 U. S. 552, 563–564 (2011). Indeed, the Court has held that "'laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference.'" *Reed*, 576 U. S., at 170 (quoting *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 658 (1994)).

*Second*, the Government argues that the legality of a robocall under the statute depends simply on whether the caller is engaged in a particular economic activity, not on the content of speech. We disagree. The law here focuses on whether the caller is *speaking* about a particular topic. In *Sorrell*, this Court held that a law singling out pharmaceutical marketing for unfavorable treatment was content-based. 564 U. S., at 563–564. So too here.

*Third*, according to the Government, if this statute is content-based because it singles out debt-collection speech, then so are statutes that *regulate* debt collection, like the Fair Debt Collection Practices Act. See 15 U. S. C. §1692 *et seq.*[4] That slippery-slope argument is unpersuasive in this case. As we explained in *Sorrell*, "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." 564 U. S., at 567. The law here, like the Vermont law in *Sorrell*, "does not simply have an effect on speech, but is directed at certain content and is aimed at particular speakers." *Ibid.* The Government's concern is understandable, but the courts have generally been able to distinguish impermissible content-based speech restrictions from traditional or or-

---

[4] This opinion uses the term "debt-collection speech" and "debt-collection robocalls" as shorthand for *government*-debt collection speech and robocalls.

Opinion of KAVANAUGH, J.

dinary economic regulation of commercial activity that imposes incidental burdens on speech. The issue before us concerns only robocalls to cell phones. Our decision today on that issue fits comfortably within existing First Amendment precedent. Our decision is not intended to expand existing First Amendment doctrine or to otherwise affect traditional or ordinary economic regulation of commercial activity.

In short, the robocall restriction with the government-debt exception is content-based. Under the Court's precedents, a "law that is content based" is "subject to strict scrutiny." *Reed*, 576 U. S., at 165. The Government concedes that it cannot satisfy strict scrutiny to justify the government-debt exception. We agree. The Government's stated justification for the government-debt exception is collecting government debt. Although collecting government debt is no doubt a worthy goal, the Government concedes that it has not sufficiently justified the differentiation between government-debt collection speech and other important categories of robocall speech, such as political speech, charitable fundraising, issue advocacy, commercial advertising, and the like.[5]

––––––––––

[5] In his scholarly separate opinion, JUSTICE BREYER explains how he would apply freedom of speech principles. But the Court's longstanding precedents, which we carefully follow here, have not adopted that approach. In essence, therefore, JUSTICE BREYER argues for overruling several of the Court's First Amendment cases, including the recent 2015 decision in *Reed* v. *Town of Gilbert*, 576 U. S. 155 (2015). Before overruling precedent, the Court usually requires that a party ask for overruling, or at least obtains briefing on the overruling question, and then the Court carefully evaluates the traditional *stare decisis* factors. Here, no party has asked for overruling, and JUSTICE BREYER's opinion does not analyze the usual *stare decisis* factors. JUSTICE BREYER's opinion therefore discounts both the Court's precedent and the Court's precedent on precedent.

### III

Having concluded that the 2015 government-debt exception created an unconstitutional exception to the 1991 robocall restriction, we must decide whether to invalidate the entire 1991 robocall restriction, or instead to invalidate and sever the 2015 government-debt exception. Before we apply ordinary severability principles, we must address plaintiffs' broader initial argument for why the entire 1991 robocall restriction is unconstitutional.

### A

Plaintiffs correctly point out that the Government's asserted interest for the 1991 robocall restriction is consumer privacy. But according to plaintiffs, Congress's willingness to enact the government-debt exception in 2015 betrays a newfound lack of genuine congressional concern for consumer privacy. As plaintiffs phrase it, the 2015 exception "undermines the credibility" of the Government's interest in consumer privacy. Tr. of Oral Arg. 38. Plaintiffs further contend that if Congress no longer has a genuine interest in consumer privacy, then the underlying 1991 robocall restriction is no longer justified (presumably under any level of heightened scrutiny) and is therefore now unconstitutional.

Plaintiffs' argument is not without force, but we ultimately disagree with it. It is true that the Court has recognized that exceptions to a speech restriction "may diminish the credibility of the government's rationale for restricting speech in the first place." *City of Ladue* v. *Gilleo*, 512 U. S. 43, 52 (1994). But here, Congress's addition of the government-debt exception in 2015 does not cause us to doubt the credibility of Congress's continuing interest in protecting consumer privacy.

After all, the government-debt exception is only a slice of the overall robocall landscape. This is not a case where a

Opinion of KAVANAUGH, J.

restriction on speech is littered with exceptions that substantially negate the restriction. On the contrary, even after 2015, Congress has retained a very broad restriction on robocalls. The pre-1991 statistics on robocalls show that a variety of organizations collectively made a huge number of robocalls. And there is no reason to think that the incentives for those organizations—and many others—to make robocalls has diminished in any way since 1991. The continuing robocall restriction proscribes *tens of millions* of would-be robocalls that would otherwise occur *every day*. Congress's continuing broad prohibition of robocalls amply demonstrates Congress's continuing interest in consumer privacy.

The simple reality, as we assess the legislative developments, is that Congress has competing interests. Congress's growing interest (as reflected in the 2015 amendment) in collecting government debt does not mean that Congress suddenly lacks a genuine interest in restricting robocalls. Plaintiffs seem to argue that Congress must be interested either in debt collection or in consumer privacy. But that is a false dichotomy, as we see it. As is not infrequently the case with either/or questions, the answer to this either/or question is "both." Congress is interested both in collecting government debt and in protecting consumer privacy.

Therefore, we disagree with plaintiffs' broader initial argument for holding the entire 1991 robocall restriction unconstitutional.

## B

Plaintiffs next focus on ordinary severability principles. Applying those principles, the question before the Court is whether (i) to invalidate the entire 1991 robocall restriction, as plaintiffs want, or (ii) to invalidate just the 2015 government-debt exception and sever it from the remainder of the statute, as the Government wants.

We agree with the Government that we must invalidate
the 2015 government-debt exception and sever that excep-
tion from the remainder of the statute.  To explain why, we
begin with general severability principles and then apply
those principles to this case.

1

When enacting a law, Congress sometimes expressly ad-
dresses severability.  For example, Congress may include a
*severability* clause in the law, making clear that the uncon-
stitutionality of one provision does not affect the rest of the
law.  See, *e.g.*, 12 U. S. C. §5302; 15 U. S. C. §78gg; 47
U. S. C. §608.  Alternatively, Congress may include a *non-
severability* clause, making clear that the unconstitutional-
ity of one provision means the invalidity of some or all of
the remainder of the law, to the extent specified in the text
of the nonseverability clause.  See, *e.g.*, 4 U. S. C. §125; note
following 42 U. S. C. §300aa–1; 94 Stat. 1797.

When Congress includes an express severability or non-
severability clause in the relevant statute, the judicial in-
quiry is straightforward.  At least absent extraordinary cir-
cumstances, the Court should adhere to the text of the
severability or nonseverability clause.  That is because a
severability or nonseverability clause leaves no doubt about
what the enacting Congress wanted if one provision of the
law were later declared unconstitutional.  A severability
clause indicates "that Congress did not intend the validity
of the statute in question to depend on the validity of the
constitutionally offensive provision."  *Alaska Airlines, Inc.*
v. *Brock*, 480 U. S. 678, 686 (1987).  And a nonseverability
clause does the opposite.

On occasion, a party will nonetheless ask the Court to
override the text of a severability or nonseverability clause
on the ground that the text does not reflect Congress's "ac-
tual intent" as to severability.  That kind of argument may

Opinion of KAVANAUGH, J.

have carried some force back when courts paid less atten-
tion to statutory text as the definitive expression of Con-
gress's will.  But courts today zero in on the precise statu-
tory text and, as a result, courts hew closely to the text of
severability or nonseverability clauses.  See *Seila Law LLC*
v. *Consumer Financial Protection Bureau*, *ante*, at 33 (plu-
rality opinion); cf. *Milner* v. *Department of Navy*, 562 U. S.
562, 569–573 (2011).[6]

Of course, when enacting a law, Congress often does not
include either a severability clause or a nonseverability
clause.

In those cases, it is sometimes said that courts applying
severability doctrine should search for other indicia of con-
gressional intent.  For example, some of the Court's cases
declare that courts should sever the offending provision un-
less "the statute created in its absence is legislation that
Congress would not have enacted."  *Alaska Airlines*, 480
U. S., at 685.  But experience shows that this formulation
often leads to an analytical dead end.  That is because
courts are not well equipped to imaginatively reconstruct a
prior Congress's hypothetical intent.  In other words, ab-
sent a severability or nonseverability clause, a court often
cannot really know what the two Houses of Congress and
the President from the time of original enactment of a law
would have wanted if one provision of a law were later de-
clared unconstitutional.

The Court's cases have instead developed a strong pre-

_____

[6] When Congress enacts a law with a severability clause and later adds
new provisions to that statute, the severability clause applies to those
new provisions to the extent dictated by the text of the severability
clause.  Likewise, when Congress has *not* included a severability clause
in initial legislation, Congress can subsequently enact a severability
clause that applies to the existing statute to the extent dictated by the
text of the later-added severability clause.  In both scenarios, the text of
the severability clause remains central to the severability inquiry.

sumption of severability.  The Court presumes that an un-
constitutional provision in a law is severable from the re-
mainder of the law or statute.  For example, in *Free Enter-
prise Fund* v. *Public Company Accounting Oversight Bd.*,
the Court set forth the "normal rule": "Generally speaking,
when confronting a constitutional flaw in a statute, we try
to limit the solution to the problem, severing any problem-
atic portions while leaving the remainder intact."  561 U. S.
477, 508 (2010) (internal quotation marks omitted); see also
*Seila Law*, *ante*, at 32 (same).  In *Regan* v. *Time, Inc.*, the
plurality opinion likewise described a "presumption" in "fa-
vor of severability" and stated that the Court should "re-
frain from invalidating more of the statute than is neces-
sary."  468 U. S. 641, 652–653 (1984).

The Court's power and preference to partially invalidate
a statute in that fashion has been firmly established since
*Marbury* v. *Madison.*  There, the Court invalidated part of
§13 of the Judiciary Act of 1789.  1 Cranch 137, 179–180
(1803).  The Judiciary Act did not contain a severability
clause.  But the Court did not proceed to invalidate the en-
tire Judiciary Act.  As Chief Justice Marshall later ex-
plained, if any part of an Act is "unconstitutional, the pro-
visions of that part may be disregarded while full effect will
be given to such as are not repugnant to the constitution of
the United States."  *Bank of Hamilton* v. *Lessee of Dudley*,
2 Pet. 492, 526 (1829); see also *Dorchy* v. *Kansas*, 264 U. S.
286, 289–290 (1924) ("A statute bad in part is not neces-
sarily void in its entirety.  Provisions within the legislative
power may stand if separable from the bad"); *Loeb* v. *Co-
lumbia Township Trustees*, 179 U. S. 472, 490 (1900) ("one
section of a statute may be repugnant to the Constitution
without rendering the whole act void").

From *Marbury* v. *Madison* to the present, apart from
some isolated detours mostly in the late 1800s and early
1900s, the Court's remedial preference after finding a pro-
vision of a federal law unconstitutional has been to salvage

Opinion of KAVANAUGH, J.

rather than destroy the rest of the law passed by Congress and signed by the President.  The Court's precedents reflect a decisive preference for surgical severance rather than wholesale destruction, even in the absence of a severability clause.

The Court's presumption of severability supplies a workable solution—one that allows courts to avoid judicial policymaking or *de facto* judicial legislation in determining just how much of the remainder of a statute should be invalidated.[7]  The presumption also reflects the confined role of the Judiciary in our system of separated powers—stated otherwise, the presumption manifests the Judiciary's respect for Congress's legislative role by keeping courts from unnecessarily disturbing a law apart from invalidating the provision that is unconstitutional.  Furthermore, the presumption recognizes that plaintiffs who successfully challenge one provision of a law may lack standing to challenge *other* provisions of that law.  See *Murphy* v. *National Collegiate Athletic Assn.*, 584 U. S. ___, ___–___ (2018) (THOMAS, J., concurring) (slip op., at 5–6).

Those and other considerations, taken together, have steered the Court to a presumption of severability.  Applying the presumption, the Court invalidates and severs unconstitutional provisions from the remainder of the law rather than razing whole statutes or Acts of Congress.  Put in common parlance, the tail (one unconstitutional provision)

---

[7]If courts had broad license to invalidate more than just the offending provision, a reviewing court would have to consider what other provisions to invalidate: the whole section, the chapter, the statute, the public law, or something else altogether.  Courts would be largely at sea in making that determination, and usually could not do it in a principled way.  Here, for example, would a court invalidate all or part of the Bipartisan Budget Act of 2015 rather than all or part of the 1991 TCPA?  After all, that 2015 Bipartisan Budget Act, not the 1991 TCPA, added the constitutionally problematic government-debt exception.  That is the kind of free-wheeling policy question that the Court's presumption of severability avoids.

does not wag the dog (the rest of the codified statute or the
Act as passed by Congress). Constitutional litigation is not
a game of gotcha against Congress, where litigants can ride
a discrete constitutional flaw in a statute to take down the
whole, otherwise constitutional statute. If the rule were
otherwise, the entire Judiciary Act of 1789 would be invalid
as a consequence of *Marbury* v. *Madison*.[8]

Before severing a provision and leaving the remainder of
a law intact, the Court must determine that the remainder
of the statute is "capable of functioning independently" and

––––––––

[8] The term "invalidate" is a common judicial shorthand when the Court
holds that a particular provision is unlawful and therefore may not be
enforced against a plaintiff. To be clear, however, when it "invalidates"
a law as unconstitutional, the Court of course does not formally repeal
the law from the U. S. Code or the Statutes at Large. Instead, in Chief
Justice Marshall's words, the Court recognizes that the Constitution is a
"superior, paramount law," and that "a legislative act contrary to the
constitution is not law" at all. *Marbury* v. *Madison*, 1 Cranch 137, 177
(1803). The Court's authority on this front "amounts to little more than
the negative power to disregard an unconstitutional enactment." *Massachusetts* v. *Mellon*, 262 U. S. 447, 488 (1923).

JUSTICE THOMAS's thoughtful approach to severability as outlined in
*Murphy* v. *National Collegiate Athletic Assn.*, 584 U. S. ___, ___–___
(2018) (slip op., at 2–6), and *Seila Law LLC* v. *Consumer Financial Protection Bureau*, *ante*, at 14–24, (joined by JUSTICE GORSUCH in the latter)
would simply enjoin enforcement of a law as applied to the particular
plaintiffs in a case. Under either the Court's approach or JUSTICE
THOMAS's approach, an offending provision formally remains on the statute books (at least unless Congress also formally repeals it). Under either approach, the formal remedy afforded to the plaintiff is an injunction, declaration, or damages. One difference between the two
approaches is this: Under the Court's approach, a provision is declared
invalid and cannot be lawfully enforced against others. Under JUSTICE
THOMAS's approach, the Court's ruling that a provision cannot be enforced against the plaintiff, plus executive respect in its enforcement policies for controlling decisional law, plus vertical and horizontal *stare decisis* in the courts, will mean that the provision will not and cannot be
lawfully enforced against others. The Court and JUSTICE THOMAS take
different analytical paths, but in many cases, the different paths lead to
the same place.

thus would be "fully operative" as a law. *Seila Law*, *ante*, at 33; see *Murphy*, 584 U. S., at ___–___ (slip op., at 25–30). But it is fairly unusual for the remainder of a law not to be operative.[9]

### 2

We next apply those general severability principles to this case.

Recall how this statute came together. Passed by Congress and signed by President Franklin Roosevelt in 1934, the Communications Act is codified in Title 47 of the U. S. Code. The TCPA of 1991 amended the Communications Act by adding the robocall restriction, which is codified at §227(b)(1)(A)(iii) of Title 47. The Bipartisan Budget Act of 2015 then amended the Communications Act by adding the government-debt exception, which is codified along with the robocall restriction at §227(b)(1)(A)(iii) of Title 47.

Since 1934, the Communications Act has contained an express severability clause: "If any provision of *this chapter* or the application thereof to any person or circumstance is held invalid, the remainder of the chapter and the application of such provision to other persons or circumstances shall not be affected thereby." 47 U. S. C. §608 (emphasis added). The "chapter" referred to in the severability clause is Chapter 5 of Title 47. And Chapter 5 in turn encompasses §151 to §700 of Title 47, and therefore covers §227 of Title 47, the provision with the robocall restriction and the government-debt exception.[10]

––––––––––

[9] On occasion, of course, it may be that a particular surrounding or connected provision is not operative in the absence of the unconstitutional provision, even though the rest of the law would be operative. That scenario may require severance of somewhat more than just the offending provision, albeit not of the entire law. Courts address that scenario as it arises.

[10] A codifier's note explains a change in wording from the original Public Law: "This chapter, referred to in text, was in the original 'this Act',

Enacted in 2015, the government-debt exception added an unconstitutional discriminatory exception to the robocall restriction. The text of the severability clause squarely covers the unconstitutional government-debt exception and requires that we sever it.

To get around the text of the severability clause, plaintiffs point out that the Communications Act's severability clause was enacted in 1934, long before the TCPA's 1991 robocall restriction and the 2015 government-debt exception. But a severability clause must be interpreted according to its terms, regardless of when Congress enacted it. See n. 6, *supra*.

Even if the severability clause did not apply to the government-debt provision at issue in this case (or even if there were no severability clause in the Communications Act), we would apply the presumption of severability as described and applied in cases such as *Free Enterprise Fund*. And under that presumption, we likewise would sever the 2015 government-debt exception, the constitutionally offending provision.

With the government-debt exception severed, the remainder of the law is capable of functioning independently and thus would be fully operative as a law. Indeed, the remainder of the robocall restriction did function independently and fully operate as a law for 20-plus years before the government-debt exception was added in 2015.

The Court's precedents further support severing the 2015 government-debt exception. The Court has long applied severability principles in cases like this one, where Congress added an unconstitutional amendment to a prior law. In those cases, the Court has treated the original, pre-

-------

meaning act June 19, 1934, ch. 652, 48 Stat. 1064, known as the Communications Act of 1934, which is classified principally to this chapter." Note following 47 U. S. C. §608.

Opinion of KAVANAUGH, J.

amendment statute as the "valid expression of the legislative intent." *Frost* v. *Corporation Comm'n of Okla.*, 278 U. S. 515, 526–527 (1929). The Court has severed the "exception introduced by amendment," so that "the original law stands without the amendatory exception." *Truax* v. *Corrigan*, 257 U. S. 312, 342 (1921).

For example, in *Eberle* v. *Michigan*, the Court held that "discriminatory wine-and-cider amendments" added in 1899 and 1903 were severable from the underlying 1889 state law generally prohibiting the manufacture of alcohol. 232 U. S. 700, 704–705 (1914). In *Truax*, the Court ruled that a 1913 amendment prohibiting Arizona courts from issuing injunctions in labor disputes was invalid and severable from the underlying 1901 law authorizing Arizona courts to issue injunctions generally. 257 U. S., at 341–342. In *Frost*, the Court concluded that a 1925 amendment exempting certain corporations from making a showing of "public necessity" in order to obtain a cotton gin license was invalid and severable from the 1915 law that required that showing. 278 U. S., at 525–528. Echoing *Marbury*, the Court in *Frost* explained that an unconstitutional statutory amendment "is a nullity" and "void" when enacted, and for that reason has no effect on the original statute. 278 U. S., at 526–527 (internal quotation marks omitted).[11]

Similarly, in 1932, Congress enacted the Federal Kidnaping Act, and then in 1934, added a death penalty provision to the Act. The death penalty provision was later declared unconstitutional by this Court. In considering severability,

_____

[11] The cases cited in the text above are pre-*Erie* decisions involving the constitutionality of state laws. See *Erie R. Co.* v. *Tompkins*, 304 U. S. 64 (1938). In that era, the Court often treated severability of state laws and federal laws in the same general way. In the post-*Erie* era, severability of state laws can potentially pose different questions than severability of federal laws. We need not address post-*Erie* severability of state laws. See, *e.g.*, *Ayotte* v. *Planned Parenthood of Northern New Eng.*, 546 U. S. 320, 328–331 (2006); *Leavitt* v. *Jane L.*, 518 U. S. 137, 139 (1996) (*per curiam*) ("Severability is of course a matter of state law").

the Court stated that the "law as originally enacted in 1932
contained no capital punishment provision." *United States*
v. *Jackson*, 390 U. S. 570, 586 (1968). And when Congress
amended the Act in 1934 to add the death penalty, "the stat-
ute was left substantially unchanged in every other re-
spect." *Id.*, at 587–588. The Court found it "difficult to im-
agine a more compelling case for severability." *Id.*, at 589.
So too here.

In sum, the text of the Communications Act's severability
clause requires that the Court sever the 2015 government-
debt exception from the remainder of the statute. And even
if the text of the severability clause did not apply here, the
presumption of severability would require that the Court
sever the 2015 government-debt exception from the remain-
der of the statute.

3

One final severability wrinkle remains. This is an equal-
treatment case, and equal-treatment cases can sometimes
pose complicated severability questions.

The "First Amendment is a kind of Equal Protection
Clause for ideas." *Williams-Yulee* v. *Florida Bar*, 575 U. S.
433, 470 (2015) (Scalia, J., dissenting). And Congress vio-
lated that First Amendment equal-treatment principle in
this case by favoring debt-collection robocalls and discrimi-
nating against political and other robocalls.

When the constitutional violation is unequal treatment,
as it is here, a court theoretically can cure that unequal
treatment either by extending the benefits or burdens to
the exempted class, or by nullifying the benefits or burdens
for all. See, *e.g.*, *Heckler* v. *Mathews*, 465 U. S. 728, 740
(1984). Here, for example, the Government would prefer to
cure the unequal treatment by extending the robocall re-
striction and thereby proscribing nearly all robocalls to cell
phones. By contrast, plaintiffs want to cure the unequal
treatment by nullifying the robocall restriction and thereby

Opinion of KAVANAUGH, J.

allowing all robocalls to cell phones.

When, as here, the Court confronts an equal-treatment constitutional violation, the Court generally applies the same commonsense severability principles described above. If the statute contains a severability clause, the Court typically severs the discriminatory exception or classification, and thereby extends the relevant statutory benefits or burdens to those previously exempted, rather than nullifying the benefits or burdens for all. In light of the presumption of severability, the Court generally does the same even in the absence of a severability clause. The Court's precedents reflect that preference for extension rather than nullification. See, *e.g.*, *Sessions* v. *Morales-Santana*, 582 U. S. ___, ___ (2017) (slip op., at 25); *Califano* v. *Westcott*, 443 U. S. 76, 89–91 (1979); *Califano* v. *Goldfarb*, 430 U. S. 199, 202–204, 213–217 (1977) (plurality opinion); *Jimenez* v. *Weinberger*, 417 U. S. 628, 637–638 (1974); *Department of Agriculture* v. *Moreno*, 413 U. S. 528, 529, 537–538 (1973); *Frontiero* v. *Richardson*, 411 U. S. 677, 678–679, 690–691 (1973) (plurality opinion); *Welsh* v. *United States*, 398 U. S. 333, 361–367 (1970) (Harlan, J., concurring in result).

To be sure, some equal-treatment cases can raise complex questions about whether it is appropriate to extend benefits or burdens, rather than nullifying the benefits or burdens. See, *e.g.*, *Morales-Santana*, 582 U. S. ___. For example, there can be due process, fair notice, or other independent constitutional barriers to extension of benefits or burdens. Cf. *Miller* v. *Albright*, 523 U. S. 420, 458–459 (1998) (Scalia, J., concurring in judgment); see generally Ginsburg, Some Thoughts on Judicial Authority to Repair Unconstitutional Legislation, 28 Clev. St. L. Rev. 301 (1979). There also can be knotty questions about what is the exception and what is the rule. But here, we need not tackle all of the possible hypothetical applications of severability doctrine in equal-treatment cases. The government-debt exception is a relatively narrow exception to the broad robocall restriction,

and severing the government-debt exception does not raise any other constitutional problems.

Plaintiffs insist, however, that a *First Amendment* equal-treatment case is different. According to plaintiffs, a court should not cure "a First Amendment violation by outlawing more speech." Brief for Respondents 34. The implicit premise of that argument is that extending the robocall restriction to debt-collection robocalls would be unconstitutional. But that is wrong. A generally applicable robocall restriction would be permissible under the First Amendment. Extending the robocall restriction to those robocalls raises no First Amendment problem. So the First Amendment does not tell us which way to cure the unequal treatment in this case. Therefore, we apply traditional severability principles. And as we have explained, severing the 2015 government-debt exception cures the unequal treatment and constitutes the proper result under the Court's traditional severability principles. In short, the correct result in this case is to sever the 2015 government-debt exception and leave in place the longstanding robocall restriction.[12]

4

JUSTICE GORSUCH's well-stated separate opinion makes a number of important points that warrant this respectful response.

JUSTICE GORSUCH suggests that our decision provides "no relief" to plaintiffs. *Post*, at 6. We disagree. Plaintiffs want to be able to make political robocalls to cell phones,

––––––––––

[12] As the Government acknowledges, although our decision means the end of the government-debt exception, no one should be penalized or held liable for making robocalls to collect government debt after the effective date of the 2015 government-debt exception and before the entry of final judgment by the District Court on remand in this case, or such date that the lower courts determine is appropriate. See Reply Brief 24. On the other side of the ledger, our decision today does not negate the liability of parties who made robocalls covered by the robocall restriction.

Opinion of KAVANAUGH, J.

and they have not received *that* relief. But the First
Amendment complaint at the heart of their suit was une-
qual treatment. Invalidating and severing the government-
debt exception fully addresses that First Amendment in-
jury.[13] JUSTICE GORSUCH further suggests that plaintiffs
may lack standing to challenge the government-debt excep-
tion, because that exception merely favors others. See *ibid*.
But the Court has squarely held that a plaintiff who suffers
unequal treatment has standing to challenge a discrimina-
tory exception that favors others. See *Heckler* v. *Mathews*,
465 U. S., at 737–740 (a plaintiff who suffers unequal treat-
ment has standing to seek "withdrawal of benefits from the
favored class"); see also *Northeastern Fla. Chapter, Associ-
ated Gen. Contractors of America* v. *Jacksonville*, 508 U. S.
656, 666 (1993) ("The 'injury in fact' in an equal protection
case of this variety is the denial of equal treatment result-
ing from the imposition of the barrier, not the ultimate in-
ability to obtain the benefit").

JUSTICE GORSUCH also objects that our decision today
"harms strangers to this suit" by eliminating favorable
treatment for debt collectors. *Post*, at 6. But that is neces-
sarily true in many cases where a court cures unequal treat-
ment by, for example, extending a burden or nullifying a
benefit. See, *e.g., Morales-Santana*, 582 U. S., at ___ (slip
op., at 28) (curing unequal treatment of children born to un-
wed U. S.-citizen fathers by extending a burden to children
of unwed U. S.-citizen mothers); *Orr* v. *Orr*, 374 So. 2d 895,
896–897 (Ala. Civ. App. 1979) (extending alimony obliga-
tions to women after a male plaintiff successfully chal-
lenged Alabama's discriminatory alimony statute in this

––––––––––

[13] Plaintiffs suggest that parties will not have incentive to sue if the
cure for challenging an unconstitutional exception to a speech restriction
is to eliminate the exception and extend the restriction. But many indi-
viduals and organizations often have incentive to challenge unequal
treatment of speech, especially when a competitor is regulated less heav-
ily.

Court).

Moreover, JUSTICE GORSUCH's approach to this case would not solve the problem of harming strangers to this suit; it would just create a different and much bigger problem. His proposed remedy of injunctive relief, plus *stare decisis*, would in effect allow all robocalls to cell phones—notwithstanding Congress's decisive choice to prohibit most robocalls to cell phones. That is not a judicially modest approach but is more of a wolf in sheep's clothing. That approach would disrespect the democratic process, through which the people's representatives have made crystal clear that robocalls must be restricted. JUSTICE GORSUCH's remedy would end up harming a different and far larger set of strangers to this suit—the tens of millions of consumers who would be bombarded every day with nonstop robocalls notwithstanding Congress's clear prohibition of those robocalls.

JUSTICE GORSUCH suggests more broadly that severability doctrine may need to be reconsidered. But when and how? As the saying goes, John Marshall is not walking through that door. And this Court, in this and other recent decisions, has clarified and refined severability doctrine by emphasizing firm adherence to the text of severability clauses, and underscoring the strong presumption of severability. The doctrine as so refined is constitutionally well-rooted, see, *e.g.*, *Marbury* v. *Madison*, 1 Cranch 137 (Marshall, C. J.), and can be predictably applied. True, there is no magic solution to severability that solves every conundrum, especially in equal-treatment cases, but the Court's current approach as reflected in recent cases such as *Free Enterprise Fund* and *Seila Law* is constitutional, stable, predictable, and commonsensical.

Cite as: 591 U. S. ____ (2020)                    25

Opinion of KAVANAUGH, J.

\*      \*      \*

In 1991, Congress enacted a general restriction on ro-
bocalls to cell phones. In 2015, Congress carved out an ex-
ception that allowed robocalls made to collect government
debt. In doing so, Congress favored debt-collection speech
over plaintiffs' political speech. We hold that the 2015 gov-
ernment-debt exception added an unconstitutional excep-
tion to the law. We cure that constitutional violation by
invalidating the 2015 government-debt exception and sev-
ering it from the remainder of the statute. The judgment of
the U. S. Court of Appeals for the Fourth Circuit is af-
firmed.

*It is so ordered.*

Cite as: 591 U. S. ____ (2020)          1

SOTOMAYOR, J., concurring in judgment

# SUPREME COURT OF THE UNITED STATES

————

No. 19–631

————

WILLIAM P. BARR, ATTORNEY GENERAL, ET AL., PETITIONERS *v.* AMERICAN ASSOCIATION OF POLITICAL CONSULTANTS, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[July 6, 2020]

JUSTICE SOTOMAYOR, concurring in the judgment.

I agree with much of the partial dissent's explanation that strict scrutiny should not apply to all content-based distinctions. Cf. *post,* at 5–9 (BREYER, J., concurring in judgment with respect to severability and dissenting in part). In my view, however, the government-debt exception in 47 U. S. C. §227(b) still fails intermediate scrutiny because it is not "narrowly tailored to serve a significant governmental interest." *Ward* v. *Rock Against Racism*, 491 U. S. 781, 791 (1989) (internal quotation marks omitted). Even under intermediate scrutiny, the Government has not explained how a debt-collection robocall about a government-backed debt is any less intrusive or could be any less harassing than a debt-collection robocall about a privately backed debt. As the Fourth Circuit noted, the government-debt exception is seriously underinclusive because it permits "many of the intrusive calls that the automated call ban was enacted to prohibit." *American Assn. of Political Consultants, Inc.* v. *FCC*, 923 F. 3d 159, 168 (2019) (case below). The Government could have employed far less restrictive means to further its interest in collecting debt, such as "secur[ing] consent from the debtors to make debt-collection calls" or "plac[ing] the calls itself." *Id.*, at 169,

n. 10; see also §227(b)(1)(A).  Nor has the Government "sufficiently justified the differentiation between government-debt collection speech and other important categories of robocall speech, such as political speech, charitable fundraising, issue advocacy, commercial advertising, and the like." *Ante*, at 9.

Nevertheless, I agree that the offending provision is severable.  See *ante*, at 2; *post*, at 11–12 (opinion of BREYER, J.); see also *City of Ladue* v. *Gilleo*, 512 U. S. 43, 51–53 (1994) (explaining that an appropriate "solution" to a law that covers "too little speech because its exemptions discriminate on the basis of [the speaker's] messages" could be to "remove" the discrimination).

With those understandings, I concur in the judgment.

# SUPREME COURT OF THE UNITED STATES

———————

No. 19–631

———————

## WILLIAM P. BARR, ATTORNEY GENERAL, ET AL., PETITIONERS *v.* AMERICAN ASSOCIATION OF POLITICAL CONSULTANTS, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[July 6, 2020]

JUSTICE BREYER, with whom JUSTICE GINSBURG and JUSTICE KAGAN join, concurring in the judgment with respect to severability and dissenting in part.

A federal statute forbids, with some exceptions, making automatically dialed or prerecorded telephone calls (called robocalls) to cell phones. This case concerns one of these exceptions, which applies to calls "made solely to collect a debt owed to or guaranteed by the United States." 47 U. S. C. §227(b)(1)(A)(iii). A majority of the Court holds that the exception violates the Constitution's First Amendment. In my view, it does not.

## I

This case concerns the Telephone Consumer Protection Act of 1991. That Act was designed to "protec[t] telephone consumers from th[e] nuisance and privacy invasion" caused by automated and prerecorded phone calls. §2(12), 105 Stat. 2395. The Act, among other things, bans almost all robocalls made to cell phones. In particular, it forbids "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service." §3(a) (codified at 47

U. S. C. §227(b)(1)(A)(iii)).  The Act delegates authority to the Federal Communications Commission to make certain additional exceptions from that general cell phone robocall restriction.  §227(b)(2)(C).

More than 20 years later, Congress enacted another statute, which created the government-debt exception.  The Office of Management and Budget had reported to Congress that in "this time of fiscal constraint . . . the Federal Government should ensure that all debt owed to the United States is collected as quickly and efficiently as possible." Office of Management and Budget, Analytical Perspectives, Budget of the U. S. Government, Fiscal Year 2016, p. 128 (2015),        https://www.govinfo.gov/content/pkg/BUDGET-2016-PER/pdf/BUDGET-2016-PER.pdf.   It recommended that Congress permit "the use of automatic dialing systems and prerecorded voice messages" to contact "wireless phones in the collection of debt owed to or granted [*sic*] by the United States."  *Ibid.*

Congress adopted that recommendation.  It enacted a provision that excepts from the general cell phone robocall restriction any call "made solely to collect a debt owed to or guaranteed by the United States."  129 Stat. 588; see also *ibid.* (categorizing the exception as a "debt collection improvemen[t]" measure).  The question here is whether the First Amendment prohibits the Federal Government from enacting that government-debt collection measure.

## II

The plurality finds the government-debt exception unconstitutional primarily by applying a logical syllogism: (1) "Content-based laws are subject to strict scrutiny." *Ante,* at 6 (citing *Reed* v. *Town of Gilbert*, 576 U. S. 155, 163–164 (2015)).  (2) The exception is based on "content." *Ante,* at 7. (3) Hence, the exception is subject to "strict scrutiny." *Ante*, at 9.  (4) And the Government concedes that the exception cannot survive "strict scrutiny" examination.  *Ibid.*

Opinion of BREYER, J.

The problem with that approach, which reflexively applies strict scrutiny to all content-based speech distinctions, is that it is divorced from First Amendment values.  This case primarily involves commercial regulation—namely, debt collection.  And, in my view, there is no basis here to apply "strict scrutiny" based on "content-discrimination."

To appreciate why, it is important to understand at least one set of values that underlie the First Amendment and the related reasons why courts scrutinize some speech restrictions strictly.  The concept is abstract but simple: "We the People of the United States" have created a government of laws enacted by elected representatives.  For our government to remain a *democratic* republic, the people must be free to generate, debate, and discuss both general and specific ideas, hopes, and experiences.  The people must then be able to transmit their resulting views and conclusions to their elected representatives, which they may do directly, or indirectly through the shaping of public opinion.  The object of that transmission is to influence the public policy enacted by elected representatives.  As this Court has explained, "[t]he First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Meyer* v. *Grant*, 486 U. S. 414, 421 (1988) (internal quotation marks omitted).  See generally R. Post, Democracy, Expertise, and Academic Freedom: A First Amendment Jurisprudence for the Modern State 1–25 (2012).

In other words, the free marketplace of ideas is not simply a debating society for expressing thought in a vacuum.  It is in significant part an instrument for "bringing about . . . political and social chang[e]." *Meyer*, 486 U. S., at 421.  The representative democracy that "We the People" have created insists that this be so.  See *Sorrell* v. *IMS Health Inc.*, 564 U. S. 552, 583 (2011) (BREYER, J., dissenting).  See generally, *e.g.,* B. Neuborne, Madison's Music: On Reading the First Amendment (2015).

It is thus no surprise that our First Amendment jurisprudence has long reflected these core values. This Court's cases have provided heightened judicial protection for political speech, public forums, and the expression of all viewpoints on any given issue. See, *e.g.*, *Buckley* v. *American Constitutional Law Foundation, Inc.*, 525 U. S. 182, 186–187 (1999) (heightened protection for "core political speech"); *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 829–830 (1995) (government discrimination on basis of "particular views taken by speakers on a subject" presumptively unconstitutional); *Boos* v. *Barry*, 485 U. S. 312, 321 (1988) ("content-based restriction[s] on political speech in a public forum" subject to "most exacting scrutiny" (emphasis deleted)); *Perry Ed. Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 45–46 (1983) (content-based exclusions in public forums subject to strict scrutiny). These cases reflect the straightforward principle that "governments must not be allowed to choose which issues are worth discussing or debating." *Reed*, 576 U. S., at 182 (KAGAN, J., concurring in judgment) (internal quotation marks omitted).

From a democratic perspective, however, it is equally important that courts not use the First Amendment in a way that would threaten the workings of ordinary regulatory programs posing little threat to the free marketplace of ideas enacted as result of that public discourse. As a general matter, the strictest scrutiny should not apply indiscriminately to the very "political and social changes desired by the people"—that is, to those government programs which the "unfettered interchange of ideas" has sought to achieve. *Meyer*, 486 U. S., at 421 (internal quotation marks omitted). Otherwise, our democratic system would fail, not through the inability of the people to speak or to transmit their views to government, but because of an elected government's inability to translate those views into action.

Thus, once again, it is not surprising that this Court has

Opinion of BREYER, J.

applied less strict standards when reviewing speech re-
strictions embodied in government regulatory programs.
This Court, for example, has applied a "rational basis"
standard for reviewing those restrictions when they have
only indirect impacts on speech. See *Glickman* v. *Wileman
Brothers & Elliott, Inc.*, 521 U. S. 457, 469–470, 477 (1997).
And it has applied a mid-level standard of review—often
termed "intermediate scrutiny"—when the government di-
rectly restricts protected commercial speech. See *Central
Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*,
447 U. S. 557, 561–564 (1980).

This account of well-established principles at the core of
the First Amendment demonstrates the problem with the
plurality's approach. To reflexively treat all content-based
distinctions as subject to strict scrutiny regardless of con-
text or practical effect is to engage in an analysis unteth-
ered from the First Amendment's objectives. And in this
case, strict scrutiny is inappropriate. Recall that the excep-
tion at issue here concerns debt collection—specifically a
method for collecting government-owned or -backed debt.
Regulation of debt collection does not fall on the first side of
the democratic equation. It has next to nothing to do with
the free marketplace of ideas or the transmission of the peo-
ple's thoughts and will to the government. It has every-
thing to do with the second side of the equation, that is, with
government response to the public will through ordinary
commercial regulation. To apply the strictest level of scru-
tiny to the economically based exemption here is thus re-
markable.

I recognize that the underlying cell phone robocall re-
striction primarily concerns a means of communication.
And that fact, as I discuss below, triggers some heightened
scrutiny, reflected in an intermediate scrutiny standard.
Strict scrutiny and its strong presumption of unconstitu-
tionality, however, have no place here.

The plurality claims that its approach, which categorically applies strict scrutiny to content-based distinctions, will not "affect traditional or ordinary economic regulation of commercial activity." *Ante,* at 9.  But how is that so? Much of human life involves activity that takes place through speech.  And much regulatory activity turns upon speech content.  See, *e.g., Reed*, 576 U. S., at 177–178 (BREYER, J., concurring in judgment) (giving examples). Consider, for example, the regulation of securities sales, drug labeling, food labeling, false advertising, workplace safety warnings, automobile airbag instructions, consumer electronic labels, tax forms, debt collection, and so on.  All of those regulations necessarily involve content-based speech distinctions.  What are the differences between regulatory programs themselves other than differences based on content?  After all, the regulatory spheres in which the Securities and Exchange Commission or the Federal Trade Commission operate are defined by content.  Put simply, treating all content-based distinctions on speech as presumptively unconstitutional is unworkable and would obstruct the ordinary workings of democratic governance.

That conclusion is true here notwithstanding the plurality's effort to bring political speech into the First Amendment analysis.  See *ante,* at 7, 25 (characterizing Congress as having "favored debt-collection speech over plaintiffs' political speech").  It is true that the underlying cell phone robocall restriction generally prohibits political speakers from making robocalls.  But that has little to do with the government-debt exception or *its* practical effect.  Nor does it justify the application of strict scrutiny.

Consider prescription drug labels, securities forms, and tax statements.  A government agency might reasonably specify just what information the form or label must contain and further provide that the form or label may not contain other information (thereby excluding political statements). No one would think that the exclusion of political speech,

say, from a drug label, means that courts must examine all
other regulatory exceptions with strict scrutiny.  Put differ-
ently, it is hard to imagine that such exceptions threaten
political speech in the marketplace of ideas, or have any sig-
nificant impact on the free exchange of ideas.  To treat those
exceptions as presumptively unconstitutional would work a
significant transfer of authority from legislatures and agen-
cies to courts, potentially inhibiting the creation of the very
government programs for which the people (after debate)
have voiced their support, despite those programs' minimal
speech-related harms.  See *Sorrell*, 564 U. S., at 584–585
(BREYER, J., dissenting).  Given the values at the heart of
the First Amendment, see *supra,* at 3–5, that interpretation
threatens to stand that Amendment on its head.  It could
also lead the Court to water down the strict scrutiny stand-
ard, which would limit speech protections in situations
where strict scrutiny's strong protections should properly
apply.  *Reed*, 576 U. S., at 178 (BREYER, J., concurring in
judgment).

   If, as I have argued, the First Amendment does not sup-
port the mechanical conclusion that content discrimination
automatically triggers strict scrutiny, what role might con-
tent discrimination play?  The plurality is correct when it
quotes this Court as having said that the government may
not discriminate "'in the regulation of expression on the ba-
sis of the content of that expression.'"  *Ante*, at 6 (quoting
*Hudgens* v. *NLRB*, 424 U. S. 507, 520 (1976)).  If, however,
this Court is to apply the First Amendment consistently
with the democratic values embodied within that Amend-
ment, that kind of statement must reflect a rule of thumb
applicable only in certain circumstances.  See *Reed*, 576
U. S., at 176 (BREYER, J., concurring in judgment); *id.,* at
183 (KAGAN, J., concurring in judgment) ("We can adminis-
ter our content-regulation doctrine with a dose of common
sense, so as to leave standing laws that in no way implicate
its intended function").

Indeed, that must be so given that this Court's First
Amendment jurisprudence itself ties the constitutional pro-
tection speech receives to the content or purpose of that
speech.   The Court has held that entire categories of
speech—for example, obscenity, fraud, and speech integral
to criminal conduct—are generally unprotected by the First
Amendment entirely because of their content.  See *Miller* v.
*California*, 413 U. S. 15, 23 (1973) (obscenity); *Virginia Bd.
of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*,
425 U. S. 748, 771 (1976) (fraud); *Giboney* v. *Empire Stor-
age & Ice Co.*, 336 U. S. 490, 498 (1949) (speech integral to
criminal conduct).  As Justice Stevens pointed out, "our en-
tire First Amendment jurisprudence creates a regime based
on the content of speech." *R. A. V.* v. *St. Paul*, 505 U. S. 377,
420 (1992) (opinion concurring in judgment); see *id.,* at
420–422 (providing examples).  Given that this Court looks
to the nature and content of speech to determine whether,
or to what extent, the First Amendment protects it, it
makes little sense to treat *every* content-based distinction
Congress has made as presumptively unconstitutional.

Moreover, it is no answer to claim that this Court's prec-
edents categorically require such an analysis.  See *ante,* at
9, n. 5 (plurality opinion).  Our First Amendment jurispru-
dence has always been contextual and has defied straight-
forward reduction to unyielding categorical rules.  The idea
that broad language in any one case (even *Reed*) has cate-
gorically determined how content discrimination should be
applied in *every single context* is both wrong and reflects an
oversimplification and over-reading of our precedent.  The
diversity of approaches in this very case underscores the
point that the law here is far from settled.  Indeed, the plu-
rality itself disclaims the idea that its rule would apply to
unsettle "traditional or ordinary economic regulation of
commercial activity," indicating that the plurality presum-
ably thinks there are some outer bounds to its broad lan-
guage.  *Ante,* at 9.  The question here is whether the Court's

Opinion of BREYER, J.

general statements about content discrimination triggering
strict scrutiny, including in *Reed,* make sense as applied in
*this* context. As I have explained, they do not.

That said, I am not arguing for the abolition of the con-
cept of "content discrimination." There are times when us-
ing content discrimination to trigger scrutiny is eminently
reasonable. Specifically, when content-based distinctions
are used as a method for suppressing particular viewpoints
or threatening the neutrality of a traditional public forum,
content discrimination triggering strict scrutiny is gener-
ally appropriate. See *Reed,* 576 U. S., at 176 (BREYER, J.,
concurring in judgment); *id.,* at 182–183 (KAGAN, J., con-
curring in judgment).

Neither of those situations is present here. Outside of
these circumstances, content discrimination can at times
help determine the strength of a government justification
or identify a potential interference with the free market-
place of ideas. See *id.,* at 176–177 (BREYER, J., concurring
in judgment). But, as I have explained, this case is not
about protecting the marketplace of ideas. It is not about
the formation of public opinion or the transmission of the
people's will to elected representatives. It is fundamentally
about a method of regulating debt collection.

III

I would examine the validity of the regulation at issue
here using a First Amendment standard that (unlike strict
scrutiny) does not strongly presume that a regulation that
affects speech is unconstitutional. However, given that the
government-debt exception does directly impact a means of
communication, the appropriate standard requires a closer
look at the restriction than does a traditional "rational ba-
sis" test. A proper inquiry should examine the seriousness
of the speech-related harm, the importance of countervail-
ing objectives, the likelihood that the restriction will
achieve those objectives, and whether there are other, less

restrictive ways of doing so.  Narrow tailoring in this con-
text, however, does not necessarily require the use of the
least-restrictive means of furthering those objectives.  Cf.
*Ward* v. *Rock Against Racism*, 491 U. S. 781, 797–799, and
n. 6 (1989) (explaining that outside of strict scrutiny review,
narrow tailoring does not require the use of least-restric-
tive-means analysis).  That inquiry ultimately evaluates a
restriction's speech-related harms in light of its justifica-
tions.  We have typically called this approach "intermediate
scrutiny," though we have sometimes referred to it as an
assessment of "fit," sometimes called it "proportionality,"
and sometimes just applied it without using a label.  See
*United States* v. *Alvarez*, 567 U. S. 709, 730–731 (2012)
(BREYER, J., concurring in judgment); *Reed*, 576 U. S., at
179 (BREYER, J., concurring in judgment).

Applying this Court's intermediate scrutiny analysis, I
would begin by asking just what the First Amendment
harm is here.  As JUSTICE KAVANAUGH notes, the govern-
ment-debt exception provides no basis for undermining the
general cell phone robocall restriction.  *Ante,* at 10–11.  In-
deed, looking at the government-debt exception in context,
we can see that the practical effect of the exception, taken
together with the rest of the statute, is to put *non*-govern-
ment debt collectors at a disadvantage.  Their speech oper-
ates in the same sphere as government-debt collection
speech, communicates comparable messages, and yet does
not have the benefit of a particular instrument of commu-
nication (robocalls).  While this is a speech-related harm,
debt-collection speech is both commercial and highly regu-
lated.  See Brief for Petitioners 20–21 (describing multiple
restrictions imposed by the Fair Debt Collection Practices
Act on communications by debt collectors in the course of
debt collection).  The speech-related harm at issue here—
and any related effect on the marketplace of ideas—is mod-
est.

Opinion of BREYER, J.

What, then, is the justification for this harm? The purpose of the exception is to further the protection of the public fisc. See *supra*, at 2. That protection is an important governmental interest. Private debt typically involves private funds; public debt typically involves funds that, in principle, belong to all of us, and help to implement numerous governmental policies that the people support.

Finally, is the exception narrowly tailored? Its limited scope shows that it is. Congress has minimized any speech-related harm by tying the exception directly to the Government's interest in preserving the public fisc. The statutory text makes clear that calls will only fall within the bounds of that exception if they are "made *solely* to collect" Government debt. 47 U. S. C. §227(b)(1)(A)(iii) (emphasis added). Thus, the exception cannot be used to permit communications unrelated or less directly related to that public fiscal interest.

The upshot is that the government-debt exception, taken in context, inflicts some speech-related harm. But the harm, as I have explained, is related not to public efforts to develop ideas or transmit them to the Government, but to the Government's response to those efforts, which here takes the form of highly regulated commercial communications. Moreover, there is an important justification for that harm, and the exception is narrowly tailored to further that goal. Given those facts, the government-debt exception should survive intermediate First Amendment scrutiny.

IV

For the reasons described above, I would find that the government-debt exception does not violate the First Amendment. A majority of the Court, however, has concluded the contrary. It must thus decide whether that provision is severable from the rest of the statute. As to that question, I agree with JUSTICE KAVANAUGH's conclusion that the provision is severable. Accordingly, I respectfully

concur in the judgment with respect to severability and dissent in part.

# SUPREME COURT OF THE UNITED STATES

———————

No. 19–631

———————

WILLIAM P. BARR, ATTORNEY GENERAL, ET AL.,
PETITIONERS *v.* AMERICAN ASSOCIATION OF
POLITICAL CONSULTANTS, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[July 6, 2020]

JUSTICE GORSUCH, with whom JUSTICE THOMAS joins as to Part II, concurring in the judgment in part and dissenting in part.

I agree with JUSTICE KAVANAUGH that the provision of the Telephone Consumer Protection Act before us violates the First Amendment. Respectfully, however, I disagree about why that is so and what remedial consequences should follow.

## I

The TCPA is full of regulations on robocalls. The statute limits robocalls to residential landlines, hospitals, emergency numbers, and business lines. The only provision before us today, however, concerns robocalls to cell phones, mobile devices, or "any service for which the called party is charged for the call." 47 U. S. C. §227(b)(1)(A)(iii). Before the law's enactment, many cell phone users had to pay for each call, so they suffered not only the pleasure of robocalls, but also the privilege of paying for them. In 1991, Congress sought to address the problem by banning nearly all unsolicited robocalls to cell phones.

But much has changed since then. Now, cell phone users often pay a flat monthly fee for unlimited minutes, reducing the cost (if not the annoyance) of hearing from robocallers.

New weapons in the fight against robocallers have
emerged, too—including tools that allow consumers to more
easily screen and block unwanted calls. Perhaps in recog-
nition of these changes, Congress relaxed the ban on cell-
phone robocallers in 2015. Today, unsolicited calls are per-
mitted if they are "made solely to collect a debt owed to or
guaranteed by the United States."

That leaves robocallers no shortage of material. The gov-
ernment backs millions upon millions of loans—student
loans, home mortgages, veterans' loans, farm loans, busi-
ness loans. When it comes to student loans alone, the gov-
ernment guarantees more than $150 billion in private loans
involving over 7 million individuals. And, to be clear, it's
not just the government that's allowed to call about these
loans. Private lenders and debt collectors are free to send
in the robots too, so long as the debt at issue is ultimately
guaranteed by the government.

Today's plaintiffs wish to use robocalls for something dif-
ferent: to campaign and solicit donations for political
causes. The plaintiffs allege that the law's continuing ban
on calls like theirs violates the First Amendment, and on
the main points of their argument the parties agree. First,
no one doubts the TCPA regulates speech. Second, every-
one accepts that restrictions on speech—no matter how ev-
enhanded—must be justified by at least a "'significant gov-
ernmental interest.'" *Ward* v. *Rock Against Racism*, 491
U. S. 781, 791 (1989). And, third, the parties agree that
laws that go further by regulating speech on the basis of
content invite still greater scrutiny. When the government
seeks to censor speech based on its content, favoring certain
voices and punishing others, its restrictions must satisfy
"strict scrutiny"—meaning they must be justified by inter-
ests that are "compelling," not just significant. After all, a
constitutional right would hardly be needed to protect pop-
ular speakers; the First Amendment does its real work in

Opinion of GORSUCH, J.

giving voice to those a majority would silence. See *McCul-
len* v. *Coakley*, 573 U. S. 464, 477–478 (2014); but see *ante,*
at 5–6 (BREYER, J., concurring in judgment with respect to
severability and dissenting in part) (seeking to overturn
precedent and allow the government sometimes to impose
content-based restrictions to "respon[d] to the public will").

In my view, the TCPA's rule against cellphone robocalls
is a content-based restriction that fails strict scrutiny. The
statute is content-based because it allows speech on a sub-
ject the government favors (collecting its debts) while ban-
ning speech on other disfavored subjects (including political
matters). Cf. *ante,* at 9–11 (opinion of BREYER, J.) (mistak-
enly characterizing the content discrimination as "not
about" political activities). The statute fails strict scrutiny
because the government offers no compelling justification
for its prohibition against the plaintiffs' political speech. In
fact, the government does not dispute that, if strict scrutiny
applies, its law must fall.

It's easy enough to see why the government makes no ef-
fort to satisfy strict scrutiny. Now that most cell phone
plans do not charge by the call, the only justification the
government cites for its robocall ban is its interest in pro-
tecting consumer privacy. No one questions that protecting
consumer privacy qualifies as a legitimate and "genuine"
interest for the government to pursue. *Ante,* at 2–3, 10. But
before the government may censor the plaintiffs' speech
based on its content, it must point to a *compelling* interest.
And if the government thinks consumer privacy interests
are insufficient to overcome its interest in collecting debts,
it's hard to see how the government might invoke consumer
privacy interests to justify banning private political speech.
Especially when consumers seem to find debt collection ef-
forts particularly intrusive: Year after year, the Federal
Trade Commission receives more complaints about the debt
collection industry than any other. The nature and breadth
of the law's exception calls into question the necessity of its

rule.

Much precedent supports this course. As this Court has long explained, a law's failure to address a wide swath of conduct implicating its supposed concern "diminish[es] the credibility of the government's [stated] rationale for [its] restrict[ion]." *City of Ladue* v. *Gilleo*, 512 U. S. 43, 52 (1994). Or, as the Court has elsewhere put it, the compellingness of the government's putative interest is undermined when its law "leaves appreciable damage to [the] supposedly vital interest unprohibited." *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 547 (1993) (internal quotation marks omitted); see also *Gonzales* v. *O Centro Espírita Beneficente União do Vegetal*, 546 U. S. 418, 433 (2006). The insight is simple: A law's failure to cover "significant tracts of conduct implicating [its] putatively compelling interes[t] can raise . . . the inference that the . . . claimed interest isn't . . . so compelling after all." *Yellowbear* v. *Lampert*, 741 F. 3d 48, 60 (CA10 2014).

That's not to say the inference is irrebuttable. The government might, for example, show that the apparent inconsistency in its law is justified by some qualitative or quantitative difference between the speech it favors and the speech it disfavors. See *id.,* at 61. So if debt collection robocalls were less invasive of consumer privacy than other kinds of robocalls, or if they were inherently rare, an exception permitting debt collection calls might not undermine the government's claimed interest in banning other calls. But the government, a party with every incentive and ample resources, has not even tried to suggest conditions like those are present here, and understandably so: The government-debt exception allows a seemingly *infinite* number of robocalls of the type consumers appear to find *most* invasive.

## II

With a First Amendment violation proven, the question

Opinion of GORSUCH, J.

turns to remedy. Because the challenged robocall ban un-
constitutionally infringes on their speech, I would hold that
the plaintiffs are entitled to an injunction preventing its en-
forcement against them. This is the traditional remedy for
proven violations of legal rights likely to work irreparable
injury in the future. Preventing the law's enforcement
against the plaintiffs would fully address their injury. And
going this far, but no further, would avoid "short circuit[ing]
the democratic process" by interfering with the work of Con-
gress any more than necessary. *Washington State Grange*
v. *Washington State Republican Party*, 552 U. S. 442, 451
(2008).

JUSTICE KAVANAUGH's opinion pursues a different
course. Invoking "severability doctrine," it declares the
government-debt exception void and severs it from the stat-
ute. As revised by today's decision, the law prohibits nearly
all robocalls to cell phones, just as it did back in 1991. In
support of this remedy, we are asked to consider cases in-
volving equal protection violations, where courts have
sometimes solved the problem of unequal treatment by lev-
eling others "down" to the plaintiff's status rather than by
leveling the plaintiff "up" to the status others enjoy.

I am doubtful of our authority to rewrite the law in this
way. Many have questioned the propriety of modern sever-
ability doctrine,* and today's case illustrates some of the
reasons why. To start, it's hard to see how today's use of
severability doctrine qualifies as a remedy at all: The plain-
tiffs have not challenged the government-debt exception,
they have not sought to have it severed and stricken, and
far from placing "unequal treatment" at the "heart of their

———————

*See, *e.g.*, *Seila Law LLC* v. *Consumer Financial Protection Bureau*,
*ante*, at 14–24 (THOMAS, J., concurring in part and dissenting in part);
Harrison, Severability, Remedies, and Constitutional Adjudication, 83
Geo. Wash. L. Rev. 56 (2014); see also Movsesian, Severability in Stat-
utes and Contracts, 30 Ga. L. Rev. 41, 41–42 (1995) (collecting academic
criticism of severability doctrine).

suit," they have never complained of unequal treatment as
such. *Ante,* at 23. The plaintiffs point to the government-
debt exception only to show that the government lacks a
compelling interest in restricting their speech. It isn't even
clear the plaintiffs would have standing to challenge the
government-debt exception. They came to court asserting
a right to speak, not a right to be free from other speakers.
Severing and voiding the government-debt exception does
nothing to address the injury they claim; after today's rul-
ing, federal law bars the plaintiffs from using robocalls to
promote political causes just as stoutly as it did before.
What is the point of fighting this long battle, through many
years and all the way to the Supreme Court, if the prize for
winning is no relief at all?

A severance remedy not only fails to help the plaintiffs, it
harms strangers to this suit. Just five years ago, Congress
expressly authorized robocalls to cell phones to collect gov-
ernment-backed debts. Yet, today, the Court reverses that
decision and outlaws the entire industry. It is highly unu-
sual for judges to render unlawful conduct that Congress
has explicitly made lawful—let alone to take such an ex-
traordinary step without warning to those who have or-
dered their lives and livelihoods in reliance on the law, and
without affording those individuals any opportunity to be
heard. This assertion of power strikes me as raising serious
separation of powers questions, and it marks no small de-
parture from our usual reliance on the adversarial process.

Nor does the analogy to equal protection doctrine solve
the problem. That doctrine promises equality of treatment,
whatever that treatment may be. The First Amendment
isn't so neutral. It pushes, always, in one direction: against
governmental restrictions on speech. Yet, somehow, in the
name of vindicating the First Amendment, our remedial
course today leads to the unlikely result that not a single
person will be allowed to speak more freely and, instead,
more speech will be banned.

Opinion of GORSUCH, J.

In an effort to mitigate at least some of these problems, JUSTICE KAVANAUGH suggests that the ban on government-debt collection calls announced today might be applied only prospectively.  See *ante*, at 22, n. 13.  But prospective decisionmaking has never been easy to square with the judicial power.  See, *e.g., James B. Beam Distilling Co.* v. *Georgia*, 501 U. S. 529, 548–549 (Scalia, J., concurring in judgment) (judicial power is limited to "discerning what the law *is*, rather than decreeing . . . what it will *tomorrow* be").  And a holding that shields *only* government-debt collection callers from past liability under an admittedly unconstitutional law would wind up endorsing the very same kind of content discrimination we say we are seeking to eliminate.

Unable to solve the problems associated with its preferred severance remedy, today's decision seeks at least to identify "harm[s]" associated with mine.  Cf. *ante*, at 24 (opinion of KAVANAUGH, J.).  In particular, we are reminded that granting an injunction in this case would allow the plaintiffs' (unpopular) speech, and that could induce others to seek injunctions of their own, resulting in still more (unpopular) speech.  But this "harm" is hardly comparable to the problems associated with using severability doctrine: Having to tolerate unwanted speech imposes no cognizable constitutional injury on anyone; it is life under the First Amendment, which is almost always invoked to protect speech some would rather not hear.

\*

In the end, I agree that 47 U. S. C. §227(b)(1)(A)(iii) violates the First Amendment, though not for the reasons JUSTICE KAVANAUGH offers.  Nor am I able to support the remedy the Court endorses today.  Respectfully, if this is what modern "severability doctrine" has become, it seems to me all the more reason to reconsider our course.